### DAYTON ENGINEERING LABORATORIES CO. et al. v. SIDNEY B. BOWMAN AUTOMOBILE CO.

(Circuit Court of Appeals, Second Circuit. December 14, 1915.)

#### No. 74.

PATENTS &#9756;328—VALIDITY AND INFRINGEMENT—MEANS FOR OPERATING MOTOR VEHICLES.

The Coleman patents, No. 745,157, claims 3, 7, 9, 12, 17, 18, and 20, and No. 842,827, claims 2, 3, 7, and 9, all relating to means for operating motor vehicles, *held* not anticipated, valid, and infringed.

Appeals from the District Court of the United States for the Southern District of New York.

Suit in equity by the Dayton Engineering Laboratories Company and another against the Sidney B. Bowman Automobile Company. From the decree, both parties appeal. Modified and affirmed.

This cause comes here upon cross-appeals from a decree entered in a patent infringement suit. Two patents are involved. The first is No. 745,157, issued November 24, 1903, on application filed February 11, 1901, to Clyde J. Coleman for "means for operating motor vehicles." The second is No. 842,827, issued January 29, 1907, on application filed February 11, 1901, to the same patentee for "means for operating motor vehicles."

The District Court, in disposing of the first patent, held that claims 3, 7, 12, 17, and 20 were valid and infringed. Complainants appeal because a like finding was not made as to claims 9, 18, and 24. Defendant appeals, assigning error in finding that any of the claims are valid; also in finding that the five first enumerated above were infringed.

In disposing of the second patent the District Court held that claims 2, 3, 7, and 9 were valid, but not infringed. Complainants appeal because the court did not find infringement of these four claims, and also because the court did not find that claims 19 and 26 were valid and infringed. Defendant appeals because the decree did not affirmatively declare that claims 19 and 26 were invalid.

The opinion of Judge Sanborn will be found in 220 Fed. 927.

---

Livingston Gifford, Drury W. Cooper, and J. B. Hayward, all of New York City, for complainants.

C. Schuyler Davis and Farnum F. Dorsey, both of Rochester, N. Y. (Edmund Wetmore, of New York City, of counsel), for defendants.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). As is apparent from the circumstance that both applications were filed on the same day, these inventions deal with a single subject-matter; the earlier patent being concerned more particularly with its mechanical side, and the later patent with its electrical side. A summary of what the patentee sets forth as his invention is found in a statement at the beginning of the specification of the first patent—in part repeated and continued in the specification of the second patent. After stating that his invention relates to motor vehicles with internal combustion engines, which are nonstarting, the patentee says:

"According to my invention means are provided for starting the engine upon the application of power thereto and for utilizing the power of the engine when the engine is self-actuated for the purpose of storing energy, these means and the engine being connected by differential connecting devices and according to my invention these means comprise a motor dyamo so connected. * * * My invention also includes provision for the discontinuance of the starting motor after the engine has been started, so that such starting motor has only to perform the work of starting the engine. * * * An electric motor is the auxiliary starting means, receiving its current from a storage battery, or other suitable electric storage means * * * and the motor, when self-actuated, starts the engine and is an auxiliary motor, and when actuated by the engine at a predetermined speed will act as a dynamo and store up electric energy in the storage means. Means are also provided whereby the speed of the motor controls connections which adapt it to the change from a motor into a dynamo, so that upon the attainment of the predetermined speed this change will be effected automatically. My invention further consists in the provision of means whereby a starting tonque of maximum force may be employed; and my invention further consists in the provision of means for controlling the speed of the engine, so that it will drive the motor at a constant speed."

In motor vehicles of this type a storage battery is commonly found which subserves several purposes, such as ignition, lighting, etc. An electrical machine is also found which, when the car is running, generates energy for the same purposes; also for keeping the storage battery charged. Sometimes there are found two of these machines, one for starting the engine, the other for the other purposes above stated. Occasionally the electric machine is utilized to supplement the internal combustion engine as a driving power to propel the car.

Since internal combustion engines cannot start themselves, various means have been employed to set them in motion—a hand-operated crank, a compressed-air motor, a gas motor, a powerful spring, an electric motor, or what not. These Coleman patents are concerned with a single electric motor, which, through electric power supplied by the storage battery, acts to start the engine, and which, after the

engine starts, ceases to act as a motor, but becomes a dynamo generating electricity to recharge the battery or to be otherwise used.

The necessities of car construction require the use of a small electric motor, of limited power. The engine to be started requires the exertion of a force greater than such motor would give out, unless its strength were in some way multiplied. This multiplication is secured by Coleman in two ways: A gear wheel of small diameter attached to the motor shaft meshes with a gear wheel of large diameter attached to the engine shaft. The small motor dynamo is thus given a high leverage. At the same time through certain field connections, automatically controlled, there is a field of high intensity created while the engine is being started. In that way the power of the small motor dynamo is able to overcome the resistance opposed to it and set the engine in operation. When the engine "fires"—i. e., starts in operation—it does so suddenly, increasing at once from the few revolutions per minute at which it ran under the applied power of the motor dynamo to many times that number of revolutions resulting from the abrupt application of its own power.

To meet this changed condition, which would produce disastrous results that need not be recited, the parts are so arranged that, as soon as the engine's own speed overruns that of the motor shaft, certain automatic clutches put the differential gearings out of business and bring into play other gearings, which will cause the engine to drive the dynamo at a rate of speed not high enough to cause evil results. Similarly, when this sudden jump in speed of the engine occurs, an automatic switch shifts the field connections, so as to produce a field of less intensity for the dynamo for charging operation. When the engine is running at comparatively high speed, driving the motor dynamo accordingly (it should be noted that the latter rotates always in the same direction), the electric current therefrom is strong enough to overcome the opposed voltage of the battery, and current flows into the battery. Should the speed of the engine be reduced sufficiently, it might happen that the voltage of the battery would overcome the voltage of the dynamo, in which event the storage would lose current, instead of storing it. This is provided for in Coleman's device by a further arrangement of switches and connections, whereby, when the engine is running so fast that it could force current back into the battery, it closes a switch, thus making a circuit through which to force the current into the battery; but, when it is running slow, connection with the battery is broken, so that none of the already stored current flows back.

As this brief synopsis indicates, we are dealing here with a complicated structure, involving not only the application of mechanical devices, but also the regulation and control of electric currents to accomplish varying results. The patents in suit are lengthy documents. Although the cause was tried in open court, the record of the testimony fills more than 700 printed pages. There are many patents introduced from the prior art. To present the whole matter, even in a compact form, would expand this opinion to an inordinate

length; but even then the discussion would be concerned almost entirely with facts, interesting possibly to the parties, but of no use in facilitating the determination of some other patent controversy. Moreover, the District Judge has written a very full and careful opinion, and the points on which we agree with him are more numerous than those on which we disagree. It seems, then, sufficient to indicate those on which we concur, briefly stating why the argument to reverse his findings is not found persuasive, and also to indicate those touching which we differ from him, briefly stating in what respect we think the record does not sustain his conclusions.

Upon the testimony Judge Sanborn held that Coleman had proved the date of his invention back to September, 1899. This finding is attacked by defendant, but we think it unnecessary to discuss it. The finding affects only the first patent, shutting out from the prior art two English patents to Lanchester—one for an air starter, No. 12,245 (July 25, 1900); the other for an ignition patent, No. 20,570 (November 28, 1900). In our opinion neither of these patents negative invention in Coleman. The air starter operates on a different principle, the driving direction is reversed, and the automatic devices of Coleman are lacking. The other Lanchester patent is for an improvement in electric ignition arrangements for gas motors, viz. to secure a constant potential in the magneto which produces ignition and to drive the magneto at sufficient speed when cranking. It does not deal at all with the problem of starting a powerful engine with a small electric motor and thereafter regulating matters so that evil results will not ensue. All that Lanchester says about starting is contained in the statement, at the end of the specification, that his device might be used to operate the starting handle shaft through independent train of gearing with a clutch properly of the positive type. There is nothing to indicate that Lanchester ever did this; certainly the device he shows would need to be radically changed to effect such result. He gives not the slightest indication as to what changes he would make. His patent is another instance of the "prophetical suggestions" found in many English patents, which have been held not to bar the field to inventors who by time, thought, and experiment devise means to fulfill the prophecy. Westinghouse Company v. Great Northern, 88 Fed. 258, 31 C. C. A. 525.

Another patent in the prior art is Gibbons & Wilcox, U. S. 581,816 (May 4, 1897). It deals with spring starters, an art which presents different problems from those confronting Coleman, and solves its own problems in a way different from that in which Coleman solved his.

Another patent set up as anticipating Coleman's first patent is Melvin, U. S. 688,262. In this there is a large electric motor, which propels the vehicle and, in addition, a gas engine which can be used to contribute to the driving power and also to run the electric motor to charge the batteries, "when the carriage is moving at a comparatively slow speed or * * * when the carriage is stationary." The circumstance that the electric motor in Melvin was itself so powerful,

being the main driving device, eliminated one element of Coleman's problem. We find nothing in Melvin which anticipates Coleman.

Of course as frequently happens with combination patents, various elements of the combination are found separately in various prior art devices combined with other elements to solve other problems; but in the citations against this first patent, and we have referred to the principal ones, we do not find the combination by which Coleman solved the various problems (dilemmas, as complainant's counsel calls them) that presented themselves when he undertook to use a single electric motor dynamo to start his gas engine, when energized by a storage battery, and afterwards, while running in the same direction, to charge the battery, under conditions which would make the charging continuous (i. e. without set-back when the main engine slowed), and to do this automatically except for the driver's single push on a button or pull on a lever.

Infringement of the first patent seems quite clear to us; indeed, defendant concedes that claims 3, 17, and 18 are infringed, if valid. Except perhaps for claim 24, which is somewhat obscure, we think defendant's device is covered by them, unless other patents (to be referred to later) require them to be very narrowly construed, a conclusion which we do not reach. The decision of the District Court holding claims 3, 7, 12, 17, and 20 valid and infringed is affirmed. That court did not discuss claims 9, 18, and 24. If 12 be valid and infringed, so is 9; if 17 be valid and infringed, so is 18. The differences between these two sets of claims is merely verbal. The decree is therefore modified, so as to find claims 9 and 18 valid and infringed.

As was said above, the first patent, although it brings in some of the electric elements, is more particularly concerned with the mechanical side of the invention; the second patent is more particularly concerned with the electrical side. In former opinions of this court the difference between these two branches of the inventive art has been pointed out. When electric forces are a prominent feature of any patent, the gentlemen retained by the opposing parties, who have made a life study of those forces, present elaborate theories, which a person, untrained as they have been, finds it very difficult to follow, and usually impossible to reconcile. All that can be done is to weigh one expert argument against the other and hold as close as may be to what was actually published to the world in the particular statements of the patents and publications which make up the prior art.

There is much of such testimony in this record, and the District Judge apparently was particularly impressed by the argument of defendant's expert to the effect that Coleman unfortunately discarded all prior art as to variable speed lighting; that in consequence the real problem was not what he conceived it to be; that such problem was to utilize the variable dynamo speed train-lighting system to the variable speed engine and dynamo; that Coleman either dodged this problem, or thought he could get something better in his own way; and that the Coleman patents would substract from rather than add knowledge to the art. In consequence the claims of the second patent

were so construed below that defendant's device was held not to be covered by them, although they were held to be valid and to read upon that device.

This theory is very skillfully presented in defendant's expert testimony and in its brief; with equal skill it is controverted in the testimony of complainant's expert and in its brief. The impression produced upon our minds from a study of this controversial literature is that the proposition that the problem before Coleman was not what he thought it was is not sustained. Summarizing from complainant's brief, the problems which Coleman thought he had to deal with were these: To start a powerful internal combustion engine by a small electric motor, which would not be able to start the engine unless its applied power was increased; this increase he secured by a differential gear and a magnetic field of high intensity. When the engine was started so that it "fired," running up quickly to many revolutions, to provide against these revolutions being multiplied in the electric motor now running as a dynamo; this protection he secured by his overrunning clutches and consequent shift of gears, and the change of connections which threw out the field of high intensity. To prevent the storage battery from losing power while the motor dynamo was running at a rate of speed not sufficient to overcome the voltage from the battery; this he did by an automatic switch which cut the battery out of circuit, as soon as the lever or push button which applied electric force to start the engine was released. To restore the battery to circuit as soon as the dynamo motor was running fast enough to force voltage into the battery; this he accomplished by another automatic switch. To prevent possible injury to the battery by too high or excessive speed in running of the engine and dynamo; this he accomplished by limiting the speed of his engine through a governor which prevented it from rising above a predetermined amount. To prevent the battery voltage from discharging when a slowing down in speed (e. g., under traffic conditions) made the dynamo voltage too feeble to resist such discharge; this he accomplished by automatically breaking connections.

Whatever other problems there were to be solved—for instance, dealing with an engine which is tied down to no predetermined running speed, an unlimited "variable speed engine"—seems to us unimportant. Equally unimportant is it whether Coleman did not know of their existence, or did know of them and "dodged" them. The thing to be considered is: Did these problems confront him? Did he show how to solve them? And is his solution a useful one? If these three questions are answered in the affirmative, the circumstance that his invention is susceptible of improvement will not defeat it; and if his invention is utilized in dealing with some other problem, accomplishing its purpose in substantially the same way, infringement will not be avoided by the slight changes necessary to adapt it to solve such other problem, although the changes may be themselves patentable.

We feel no hesitancy in answering these three questions in the affirmative. It is next in order to examine the patents of the prior art to

see if they require such a disallowance or curtailment of the claims by which Coleman has sought to protect his invention that infringement of them cannot be found in defendant's device, upon which certainly they read. Two only need be referred to: Washburn and Munson. This does not mean that the others (Patton, Greengrass, etc.) have been overlooked; no motion for reargument need be made on the theory that they were not read and considered.

Washburn—U. S. 550,002, November 19, 1895—is for a self-propelling vehicle, boat, etc. His invention is to provide a system of propulsion in which may be employed a prime mover, which will serve to rotate or assist in rotating the driving shaft or axle and also and at the same time serve to operate a dynamo electric machine and generate electrical energy, which is stored in an accumulator (battery); the parts to be so combined that the stored energy will be utilized in rotating the shaft by the automatic transformation of the dynamo into a motor whenever the electro-motive force of the accumulator exceeds the opposing force of the dynamo. Both motors are used to propel the vehicle, but Washburn also states that he may start his gas engine (in the event a gas engine is employed) by connecting his electric motor to the battery. He says nothing about increasing the field intensity to make it operative; the relative size of the two motors was such that Coleman's first problem was not presented. Elsewhere he states that:

"If for any reason the combined power of the prime mover and electric motor is insufficient to move the car, a rheostat in the field circuit of the dynamo motor is adjusted so as to strengthen the field."

Apparently this is a hand-operated rheostat. Such a use of rheostats to effect intensities was well known in the art. We fail to find in Washburn any suggestion of the problems with which Coleman dealt, and certainly no proposed solution of them. We cannot concur in the conclusion of Judge Sanborn that this patent "shows Coleman's fundamental idea."

Munson—U. S. patent No. 653,199, July 3, 1900—points out the inconveniences which result in the case of an electrically propelled vehicle when its storage batteries run out and it is necessary to go to a power station to have them recharged. His object was:

"To provide a combined electric and vapor vehicle, the electric motor thereof being employed to propel the vehicle, and the engine to be employed to drive said motor as a dynamo, for the purpose of replenishing the batteries at times when the vehicle is still, as when in the barn or waiting in the road."

Another object is to provide means—

"whereby, after the engine is started to charge the batteries, it may be left unattended and the engine will be automatically stopped when the battery is fully charged."

This "means" consists of two different field windings, controlled by two switches *I*, and *J*, both hand switches. Without going into the details of the patent it is sufficient to say that it does not deal with the problems Coleman had to dispose of, and, of course, does not solve

them. We cannot agree with the District Judge that it discloses the fundamental idea of Coleman's combination.

So much of the decree as holds claims 2, 3, 7, and 9 to be valid is affirmed. The District Judge found that claim 7 reads on defendant's apparatus—the other three claims above enumerated do so equally—but he imposed limitations upon those four claims because he was satisfied that Washburn and Munson disclosed the fundamental conception of Coleman's invention. Since we do not so construe these two prior patents, the limitations are not to be imposed. It would needlessly expand this opinion to take up, piece by piece, the elements of defendant's machine and point out the particular language of each claim which covers it; we do not understand that defendant contends that, construing the claims as we do, they are not infringed. But, if he does, it will be sufficient to say that we do not agree with him.

We do not think it necessary to discuss claims 19 and 26, about which the District Judge made no finding. The disposition made of the other claims sufficiently disposes of the concrete controversy presented by the device now before us, and therefore the application to declare those two claims invalid is denied, without expressing about them specifically any opinion which will interfere with their interpretation when some other device which requires such interpretation may be the subject of controversy.

The decree of the District Court is modified as above indicated, and, as modified, is affirmed, with costs to complainant.